Brandt Silverkorn (SBN 323530)
bsilverkorn@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiffs and the Putative Classes*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| CORINNE PEARSON and MELENIE CRUTCHER, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> GOOGLE LLC, a Delaware limited liability company, <br><br> *Defendant*. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR** <br><br> **(1) Violations of Cal. Penal Code § 631(a);** <br> **(2) Violations of 18 U.S.C. § 2510, *et seq.*;** <br> **(3) Intrusion Upon Seclusion; and** <br> **(4) Invasion of Privacy** <br><br> **DEMAND FOR JURY TRIAL** |

## <u>CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiffs Corinne Pearson and Melenie Crutcher bring this Class Action Complaint and Demand for Jury Trial on behalf of themselves and all others similarly situated against Defendant Google LLC. Plaintiffs seek relief for Google's unlawful interception of Americans' communications and its bulk transmission of Americans' sensitive personal information to entities subject to the jurisdiction and influence of the Chinese Communist Party in violation of federal law and fundamental privacy rights. Plaintiffs allege the following based on personal knowledge as to themselves and on information and belief as to all other matters.

1

CLASS ACTION COMPLAINT
CASE NO.

## <u>NATURE OF THE ACTION</u>

1.      This case arises from a dangerous and unlawful data-sharing arrangement between Google and companies controlled by a foreign adversary of the United States. Google knowingly and systematically transmits sensitive user data intercepted from U.S. websites to Baidu, a Chinese technology company that the Pentagon has formally identified as a "Chinese Military Company," and to Temu, a Chinese e-commerce platform with deep ties to the People's Republic of China, the Chinese government and ruling party, and widely reported links to its intelligence apparatus.

2.      In April 2025, the U.S. Department of Justice implemented the Data Security Program, a national security initiative codified at 28 C.F.R. Part 202 (the "Bulk Sensitive Data Rule" or "BSD Rule") pursuant to Executive Order 14117.

3.      The BSD Rule prohibits transferring in bulk the sensitive personal data of Americans to persons or entities tied to "countries of concern," including China, to prevent adversarial countries from acquiring data that can be used to surveil, exploit, or model U.S. consumer behavior.

4.      As a senior Justice Department official explained, the BSD Rule aims to stop foreign governments from sidestepping American cybersecurity protections entirely: "[W]hy would you go through the trouble of complicated cyber intrusions and theft to get Americans' data when you can just buy it on the open market or force a company under your jurisdiction to give you access? . . . The [BSD Rule] makes getting that data a lot harder."[1]

5.      The BSD Rule makes clear that it is unlawful for advertising platforms operating in the U.S. to send Americans' personal data to Chinese companies through automated tracking and targeting systems. The Justice Department has explained that this includes sharing identifiers and behavioral information with platforms linked to foreign governments. That is precisely the kind of data-sharing misconduct at issue in this case.

---

[1] Press Release, *Justice Department Implements Critical National Security Program to Protect Americans' Sensitive Data from Foreign Adversaries*, U.S. Dep't of Just. (Apr. 11, 2025), https://www.justice.gov/opa/pr/justice-department-implements-critical-national-security-program-protect-americans-sensitive (internal quotation omitted).

CLASS ACTION COMPLAINT
CASE NO.

6.     In direct violation of the BSD Rule, Google, through its automated advertising infrastructure, transmits U.S. user data to Baidu and Temu on websites where Google has established identity-synchronization integrations with those companies' servers. Baidu and Temu receive this data in real time as part of their participation in Google's advertising system.

7.     Baidu and Temu have come under increasing scrutiny from regulators and members of Congress over concerns that their data practices may facilitate surveillance by the Chinese government. The Department of Defense recently designated Baidu a "Chinese Military Company" operating in the United States—a formal determination that the Pentagon regards Baidu as functioning as an extension of the PRC's military apparatus. Temu has drawn similar alarm from Congress, and investigators have warned that it may operate as a conduit for state-directed data collection targeting U.S. residents.

8.     As of July 2026, Google maintained direct integrations with Baidu, Temu, and other Chinese technology companies, enabling those entities to receive persistent identifiers, IP addresses, and other device-level data from U.S. consumers' online activities each time Google's tracking code executed on an integrated website. These transmissions fall squarely within the BSD Rule's definition of bulk sensitive personal data and are expressly prohibited.

9.     Google had ample notice that its conduct was unlawful. It participates in industry associations that engaged directly with the BSD Rule rulemaking process and publicly warned members of the legal risks of transmitting behavioral data to entities based in China. Google itself engineered the identity-synchronization infrastructure that effects these transfers, and it publicly lists both Baidu and Temu as partners in its advertising ecosystem on an obscure developer-facing site. Google cannot claim ignorance of data flows it designed, operates, and openly acknowledges.

10.     Google's conduct gives rise to claims under the Electronic Communications Privacy Act ("ECPA" or "Wiretap Act"), 18 U.S.C. § 2510, *et seq.*, because Google intentionally intercepted consumers' communications with the intention of disclosing that data in furtherance of a criminal and tortious act: specifically, the unlawful transmission of U.S. consumers' bulk

3

CLASS ACTION COMPLAINT
CASE NO.

sensitive personal data to prohibited foreign entities in violation of the BSD Rule. Separately, Google's interception of California consumers' communications—independent of any transmission to Chinese-controlled companies—violates the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.* Google's surveillance and distribution of California consumers' sensitive information, including to entities linked to foreign adversaries, also constitutes an intrusion upon seclusion under California common law and violates the right to privacy guaranteed by the California Constitution.

11.     This case raises urgent questions at the intersection of privacy, commercial surveillance, and national security. The U.S. government has determined that the export of Americans' sensitive data to hostile foreign regimes constitutes an "unusual and extraordinary threat . . . to the national security and foreign policy of the United States that has been repeatedly recognized across political parties and by all three branches of government."[2] Google ignored that warning. It must now be held accountable.

12.     Plaintiffs Pearson's and Crutcher's sensitive and private information was unlawfully intercepted and then shared by Google with Baidu and Temu. Plaintiffs seek statutory damages under the ECPA and CIPA, as well as equitable relief, including an injunction barring Google from continuing to intercept user communications and from making unlawful data transfers to entities affiliated with foreign adversaries.

## PARTIES

13.     Plaintiff Corinne Pearson is a natural person and citizen of the State of California.

14.     Plaintiff Melenie Crutcher is a natural person and citizen of the State of Florida.

15.     Defendant Google LLC is a limited liability company organized under the laws of Delaware, with its principal place of business at 1600 Amphitheatre Parkway, Mountain View,

---

[2] Press Release, *Justice Department Implements Critical National Security Program to Protect Americans' Sensitive Data from Foreign Adversaries*, U.S. Dep't of Just. (Apr. 11, 2025), https://www.justice.gov/opa/pr/justice-department-implements-critical-national-security-program-protect-americans-sensitive (internal quotation omitted).

4

CLASS ACTION COMPLAINT
CASE NO.

California 94043. Google is a wholly owned subsidiary of Alphabet Inc.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action: (1) pursuant to 28 U.S.C. § 1331 because cases under the ECPA, 18 U.S.C. § 2510, *et seq.*, raise a federal question and (2) pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than any Defendant, (ii) there are more than 100 Class members, (iii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iv) none of the exceptions under that subsection apply to this action.

17.     This Court has supplemental jurisdiction over Plaintiff Pearson's state-law claims under 28 U.S.C. § 1367 because those claims arise from the same case or controversy as Plaintiff Pearson's federal claims under the ECPA.

18.     This Court has personal jurisdiction over Defendant because Google is headquartered in this District, conducts substantial and continuous business within this District, and maintains its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California, which is within this District. Google's advertising infrastructure, including the systems at issue in this action, is developed, maintained, and operated from facilities within this District.

19.     Venue is proper pursuant to both 28 U.S.C. § 1391(b)(1) because Defendant resides in this District and 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District. Specifically, Google develops, maintains, and operates its advertising infrastructure, including the cookie syncing systems and real-time bidding platforms at issue, from its headquarters and facilities located within this District. The decisions to implement, configure, and maintain integrations with foreign advertising partners, including those subject to Chinese jurisdiction, were made and executed from within this District.

## DIVISIONAL ASSIGNMENT

20.     Pursuant to Northern District of California Civil Local Rules 3-2(c), 3-2(e), and 3-5(b), assignment to the San Jose Division is proper because a substantial part of the events giving

CLASS ACTION COMPLAINT
CASE NO.

rise to Plaintiff Pearson's claims occurred in Santa Clara County.

## COMMON FACTUAL ALLEGATIONS

**I.      Google's Scale and Reach in the Online Advertising Ecosystem.**

21.     Google dominates the online advertising ecosystem, and advertising constitutes Google's primary source of revenue. Google is forecast to reach $239.54 billion in advertising revenue in 2026, accounting for more than a quarter of all global digital ad spending.

22.     Google occupies a central and unavoidable position in the modern online advertising ecosystem. Programmatic advertising—often sold through automated real-time bidding ("RTB") auctions described below—accounts for the vast majority of digital advertising in the United States, with industry estimates indicating that nearly 90% of digital ads are delivered through this model. Google is a major participant in this ecosystem, operating at multiple levels of the advertising stack, i.e., the layers of technology involved in delivering digital ads from advertiser to end users.

**A.      Google's Multiple Roles in the Online Advertising Ecosystem Enable It to Collect, Enrich, and Distribute User Data.**

23.     Google operates simultaneously on both sides of the programmatic advertising market. On the "buy side," it provides tools and infrastructure that allow advertisers and demand-side platforms—companies that act on behalf of advertisers to evaluate users and automatically submit bids for advertising opportunities across the web—to participate in real-time advertising auctions. On the "sell side," it integrates directly with publishers by providing software and code that publishers embed into their websites and applications to monetize advertising space.

24.     Bridging these two sides, Google also operates as an advertising exchange and marketplace. In this role, Google functions as the central intermediary that receives open spots on websites and mobile applications where advertisements can be displayed, assembles and enriches data about the user viewing the page, distributes that data to potential advertisers, collects bids in real time, and determines which advertisement is ultimately shown to the user.

CLASS ACTION COMPLAINT
CASE NO.

25.     In simpler terms, Google operates a data-brokerage market in which access to users, and the most sensitive details of their private web-browsing, is continuously auctioned to the highest bidder. The market is triggered each time a user loads a webpage or opens an application that displays programmatic advertising.

26.     As detailed below, Google's advertising exchange and profiling operations rely on a coordinated set of technologies that enable the large-scale interception and sharing of user data.

**B.     Google Intercepts Website Communications, Diverts the Data to Its Own Servers, and Syncs User Identifiers with Third Parties to Enrich Consumer Browsing Data.**

27.     To power its advertising platform, Google provides publishers with invisible tracking and auction technologies that are embedded directly into publishers' websites and mobile applications.

28.     These technologies execute automatically within users' browsers and devices when a page loads, allowing Google to intercept, duplicate, and redirect data generated during users' electronic communications with websites.

29.     Google's interception technologies include, among others:

a.      JavaScript tracking scripts, which are embedded in webpages and execute automatically when a page loads, causing the user's browser to transmit information about the user's session, device, and page activity to Google-controlled servers;

b.      Identity-syncing endpoints, which instruct the user's browser—typically through HTTP redirects and cookie-based requests—to contact Google and third-party tracking domains to exchange identifiers so that multiple adtech entities can recognize and track the same user across websites and sessions.

30.     When a user visits a website incorporating Google's tracking infrastructure, Google's code executes contemporaneously with the user's communication with the website. Information intended for the first-party website—such as requests for page content—is duplicated

7

CLASS ACTION COMPLAINT
CASE NO.

and redirected to Google's servers as part of the advertising and auction process, without the user's knowledge or consent.

31.    For example, when a user visits a website that incorporates Google's tracking infrastructure, Google's embedded code runs automatically as the page loads. While the user is in the process of viewing the page, that code causes the user's browser to collect and transmit information about the user and the page being accessed—including persistent identifiers associated with the user, technical details about the user's device and browser, and the full URL of the webpage—to Google.

32.    This information is transmitted to Google as part of an automated advertising request which Google then controls and distributes to other participants in the advertising auction so they can decide whether and how to target the user. Google will then solicit bids from other advertisers through what is known as a "bid request."

33.    The bid request includes information describing the substance of the user's communication with the website, including the full URL of the page being viewed and the referring source. This data reveals the specific content the user is accessing—such as articles, forum posts, or other sensitive material—at the precise moment the data is intercepted and transmitted.

34.    In addition to duplicating and diverting website communications to its own servers, Google synchronizes user identifiers with third parties through a process commonly known as "identity syncing," or "user syncing." This process instructs the user's browser to contact Google-controlled and third-party servers to exchange unique identifiers. To do this, it directs the user's browser to contact a server endpoint owned by the third party such as www.temu.com/api/adx/cm/pixel-google or gtrace.mediago.io/ju/cs/google (MediaGo is Baidu's global advertising platform), passing the Google User ID to the third party in the request.

35.    Through this process, Google maps browser-based identifiers to server-side identity records, allowing Google and its partners to recognize and track the same individual across different websites, sessions, devices, and contexts. This linkage enables long-term tracking and aggregation

CLASS ACTION COMPLAINT
CASE NO.

of users' browsing behavior even where a user has never directly interacted with Google or its downstream partners.

## II. Google's Identity Synchronization with Chinese Companies Results in Dangerous and Ongoing Transfers of Americans' Sensitive Data in Violation of Federal Law.

### A. Google Actively Synchronizes Persistent Identifiers with a Chinese Company that the Pentagon Has Identified as an Instrument of the Chinese Military.

36.     As part of its RTB operations, Google maintains active identity synchronization integrations that permit the exchange of persistent identifiers with multiple Chinese technology companies. At least one of those companies—Baidu, Inc.—has been identified by the U.S. Department of Defense as a Chinese military company operating in the United States.

37.     Baidu, Inc. is a sprawling Chinese technology company headquartered in Beijing. Founded in 2000, Baidu specializes in internet services and artificial intelligence. Its core business is online search, where it holds a dominant position in China's search engine market, with online marketing as a key source of revenue. The company has also diversified substantially into artificial intelligence, building a full-stack business that includes foundation models, generative AI chatbots, deep learning platforms, cloud infrastructure, and semiconductor design.

38.     The problem with sharing Americans' data with companies like Baidu is not their foreign ownership; it is their obligations to the Chinese state. The U.S. Department of State has described the PRC's national development strategy as one of "Military-Civil Fusion," a deliberate and compulsory dissolution of the barriers between China's civilian commercial enterprises and its military and defense industrial sectors. Under this strategy, ostensibly private technology companies serve as instruments of state and China's burgeoning military power.

39.     Baidu has been directly identified as just such an instrument. Pursuant to Section 1260H of the National Defense Authorization Act for Fiscal Year 2021, the United States Department of Defense maintains a regularly updated list of "Chinese Military Companies" operating in the United States (the "1260H List"). Inclusion on the 1260H List is a public statement

9

CLASS ACTION COMPLAINT
CASE NO.

by the Pentagon that it regards the listed company as functioning as an extension of the PRC's military apparatus.

40.    The 1260H List captures a wide cross-section of China's economic operations, spanning technology companies of every kind, from component manufacturers to biotechnology firms to robotics companies. In 2026, Baidu was added.[3]

41.    The presence of Baidu on the 1260H List underscores the gravity of what is alleged here. When Google synchronizes persistent identifiers and exchanges data with Baidu, Google is not merely sharing information with foreign commercial actors. It is channeling bulk sensitive data concerning United States citizens to an entity that the United States government has formally identified as an extension of the Chinese military, posing a profound danger to both individual privacy and national security.

**B.    Google Actively Synchronizes Persistent Identifiers with Temu, Another Chinese Company Subject to the Jurisdiction and Control of the Chinese Communist Party.**

42.    Temu is a Chinese e-commerce company owned by PDD Holdings, Inc. Temu launched its U.S. operations in September 2022 and has since become the subject of widespread concern from U.S. government officials, law enforcement agencies, and national security experts regarding its invasive data-collection practices and ties to the Chinese Communist Party.

43.    In April 2024, multiple U.S. Senators wrote to President Biden about Temu's dangerous conduct. U.S. Senator Tom Cotton warned that Temu was "harvesting vast amounts of personal information from American consumers," posed a threat to "every single American's personal privacy," and "may be selling data collected on Temu to entities affiliated with the

---

[3] *Entities Identified as Chinese Military Companies Operating in the United States in Accordance with Section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021*, U.S. Dep't of Def. (June 8, 2026), https://media.defense.gov/2026/Jun/08/2003945537/-1/-1/1/ENTITIES-IDENTIFIED-AS-CHINESE-MILITARY-COMPANIES-OPERATING-IN-THE-UNITED-STATES-IN-ACCORDANCE-WITH-SECTION-1260H.PDF.

10

CLASS ACTION COMPLAINT
CASE NO.

Chinese Communist Party."[4] Around the same time, Congressman Brian Mast urged the FTC to investigate Temu's connections to the CCP.[5]

44.    In September 2024, Congressional Republicans on the House Permanent Select Committee on Intelligence formally requested briefings from the FBI and Securities and Exchange Commission regarding Temu and its parent company. The members stated that they were "concerned about the protection of Americans' data" and emphasized that, "[a]nalogous to Congress' action on TikTok, the relationship between the Chinese Communist Party, Chinese national security laws, and Americans data must be understood," further expressing concerns that the Chinese Communist Party may be attempting to exploit U.S. democratic institutions, free-market principles, and the personal and economic data of Americans.[6]

45.    Multiple independent analyses have detailed the invasive nature of Temu's data collection practices. For example, in October 2024, the Center for Strategic and International Studies issued a report highlighting Temu's concerning data collection practices and its legal obligation to cooperate with Chinese intelligence agencies.

46.    In July 2025, Kentucky Attorney General Russell Coleman filed a lawsuit against Temu, alleging that Temu illegally provides the Chinese government with access to Americans' data. Arkansas, Arizona, Nebraska, Oklahoma, and Texas Attorneys General have filed similar lawsuits alleging that Temu's mobile app functions as spyware designed to harvest Americans' personal information.

47.    Despite the widely recognized national security risks posed by Temu and its documented data-collection practices, Google has knowingly maintained active technical

---

[4] Letter from Sen. Tom Cotton to President Joseph R. Biden (Apr. 15, 2024), https://www.nationalreview.com/wp-content/uploads/2024/04/temu_letter.pdf.

[5] Office of Rep. Brian Mast, *Mast Demands FTC Probe Temu for Alleged Ties to the Chinese Communist Party* (Apr. 17, 2024), https://mast.house.gov/2024/4/mast-demands-ftc-to-probe-temu-for-its-alleged-ties-to-ccp.

[6] Press Release, *LaHood, HPSCI Republicans Sound Alarm on Temu, Request Briefing from FBI and SEC*, House Permanent Select Committee on Intelligence (Sept. 25, 2024), https://intelligence.house.gov/2024/09/25/lahood-hpsci-republicans-sound-alarm-on-temu-request-briefing-from-fbi-and-sec/.

CLASS ACTION COMPLAINT
CASE NO.

integrations with Temu that enable the systematic transfer of Americans' persistent identifiers and related data through identity synchronization.

**C.    Google's Identity Synchronization Enables Baidu and Temu to Track Millions of Americans Across the Internet.**

48.    Google intentionally integrated Baidu and Temu as partners into its identity synchronization framework. As part of Google's integration with each partner, Google's code causes users' browsers to silently exchange identifiers with the partner's servers. The browser transmits Google's identifier for the user (called a "google_gid" or the "Google User ID") and receives in return the partner's own internal identifier for the same individual. This process, described more fully below, operates identically for Baidu and Temu.

49.    Before this exchange occurs, Google and the partner each know the same user only by their own internal identifiers. In other words, both companies may hold data about the same individual, but neither can recognize that fact, because each labels that individual using its own private identifier.

50.    Identity synchronization solves this problem for the companies. Google's code directs the user's browser to send a request to the partner's server that includes the user's Google User ID. The browser executes this request automatically and invisibly, transmitting the user's unique Google User ID—along with other data, including the user's IP address—directly to the partner's server.

51.    Upon receiving that request, the partner links the user's Google User ID to its own internal identifier for the same user. From that point forward, the partner can match any data associated with one identifier to data associated with the other. The practical effect is that the partner can combine everything it already knows about the user from its own platform with everything it receives about that user through Google's RTB auctions, thus merging two previously separate profiles of the same individual into a single, richer profile that persists indefinitely.

CLASS ACTION COMPLAINT
CASE NO.

52.     Through this identity synchronization process, each partner receives persistent identifiers tied to American users, along with associated IP addresses and other technical metadata, and links that information to its own internal user profiles. This creates a persistent linkage that allows the partner to recognize and track the same individual across the RTB advertising ecosystem and across unrelated websites and digital contexts.

53.     This linkage does not expire when the user closes their browser. Because both Google's identifier and the partner's identifier are stored as long-lived cookies on the user's device, the linkage persists for months or years, allowing the partner to build a continuously expanding record of the user's browsing activity across Google's entire publisher network.

54.     The harm does not end there. Once a partner has synchronized identifiers with Google, it can use that linkage to make sense of bidstream data it receives from other participants in the RTB ecosystem.

55.     In the RTB ecosystem, dozens of advertising platforms routinely broadcast bid requests containing persistent identifiers, URLs, and behavioral segment data. Using the synchronized identifiers as a common key, Baidu and Temu can each match and aggregate this information from multiple sources, assembling comprehensive profiles of American consumers' browsing behavior, interests, health concerns, and inferred characteristics, even for users who have never visited either company's website or knowingly interacted with its services.

56.     As explained below, federal national security law prohibits Google's transmission of persistent identifiers and IP addresses to these companies.

**D.      The BSD Rule Prohibits Google's Transmission of Americans' Persistent Identifiers to CCP-Linked Entities Like Baidu and Temu.**

57.     On April 8, 2025, the BSD Rule, issued by the U.S. Department of Justice and codified at 28 C.F.R. Part 202, took effect, restricting the transfer of Americans' bulk sensitive personal data to "countries of concern"—including the People's Republic of China. The BSD Rule

13

was promulgated pursuant to Executive Order 14117, which identified the unrestricted transfer of Americans' personal data to foreign adversaries as a national security threat.

58.    Under the BSD Rule, it is unlawful to engage in any "covered data transaction" that involves the transfer of "bulk U.S. sensitive personal data" or "bulk covered personal identifiers" to entities that are owned by, controlled by, subject to the jurisdiction of, or organized under the laws of a country of concern. 28 C.F.R. §§ 202.206, 202.210, 202.211(a), 202.212, 202.301(a).

59.    The U.S. government has determined that the export of Americans' behavioral data to hostile foreign regimes or entities under their jurisdiction constitutes an "'unusual and extraordinary threat . . . to the national security and foreign policy of the United States' that has been repeatedly recognized across political parties and by all three branches of government."

60.    The BSD Rule defines "covered personal identifiers" to include persistent identifiers such as advertising IDs, device identifiers, and IP addresses. The rule establishes "bulk" thresholds that trigger liability: transfers involving data linked to more than 100,000 U.S. persons over a 12-month period constitute prohibited bulk transfers. 28 C.F.R. §§ 202.205, 202.211.

61.    The BSD Rule provides examples of prohibited conduct that directly parallel Google's practices. One example describes a scenario in which a U.S. company that sells advertising space provides IP addresses and advertising identifiers associated with more than 100,000 U.S. persons to an advertising exchange located in a country of concern over a 12-month period. 28 C.F.R. § 202.214(b)(4). The rule explains that this constitutes a covered data transaction involving data brokerage and is unlawful because IP addresses and advertising identifiers, when transferred in bulk, qualify as bulk covered personal identifiers.

62.    That is precisely what Google does. Through its advertising exchange and identity-synchronization operations, Google transmits U.S. users' persistent advertising identifiers—specifically, Google GID identifiers—and IP addresses to Baidu and Temu, entities operating under the jurisdiction of the People's Republic of China. These transmissions occur regularly, at massive

14

CLASS ACTION COMPLAINT
CASE NO.

scale, affecting millions of American users and vastly exceeding the BSD Rule's 100,000-person bulk threshold.

63.    Google has knowingly continued routing Americans' sensitive user data to Baidu and Temu even after the BSD Rule took effect on April 8, 2025, after widespread public reporting, congressional investigations, and state lawsuits documenting Temu's national security risks and invasive data practices, and even after Baidu's appearance on the Pentagon's 1260H List of "Chinese military companies."

**E.    Google Knowingly Engaged in Prohibited Data Transfers Despite Clear Warnings.**

64.    Google is the largest and most sophisticated actor in digital advertising, and no company was better positioned to understand the BSD Rule's application to adtech. Google is also a member of the Network Advertising Initiative ("NAI"), which participated directly in the BSD Rule rulemaking. In its November 29, 2024 comment letter, the NAI acknowledged that its members "share data extensively via real-time bidding" and unsuccessfully urged the DOJ to soften the Rule's "reasonably should have known" liability standard. Google's own trade association thus identified the precise legal risk at issue in this case—and put its members, including Google, on notice that it remained.

65.    Google's awareness of this legal risk is further reflected in corporate disclosures made by its parent company. In Alphabet's 2025 Annual Report (Form 10-K), the company warned investors that its advertising operations are subject to rapidly evolving privacy and data transfer regulations, including cross-border restrictions that could materially impact business operations. As a wholly owned Alphabet subsidiary, Google is subject to centralized legal oversight, and its business practices are shaped by shared infrastructure, policies, and contractual standards across Alphabet's advertising ecosystem.

66.    Google also maintains documentation for developers identifying the third-party partners integrated into its advertising ecosystem, including entities that receive user data through

15

CLASS ACTION COMPLAINT
CASE NO.

identifier synchronization. Both Baidu and Temu appear in that documentation. Google cannot plausibly claim ignorance of data transfers it engineered, maintains, and publicly acknowledges.

67.     Despite clear guidance from the DOJ, widespread warnings from the Pentagon, U.S. government officials and law enforcement, and despite multiple lawsuits alleging that Temu functions as spyware for the Chinese government, Google has continued to transmit sensitive user data to Baidu and Temu.

68.     By maintaining active identity synchronization integrations with Baidu and Temu—companies that have been specifically identified as threats to national security—Google has knowingly facilitated the export of Americans' behavioral data to a foreign adversary.

69.     In doing so, Google has disregarded regulations enacted specifically to address what the U.S. government has called an "unusual and extraordinary threat" to the national security and foreign policy of the United States.[7]

## III.     Consumers Lack Notice, Choice, or the Ability to Consent to Google's Surveillance and Data Transfers.

70. Plaintiffs and Class members did not consent to Google's conduct. Google never discloses that it intercepts and then transmits users' data to companies controlled by a foreign adversary of the United States, including one company the Pentagon has designated a Chinese Military Company.

71. No reasonable person would agree to this arrangement in any event. Whatever users may generally understand about online advertising, no one browsing a website in America expects—or would ever accept—that their sensitive browsing data will be handed to instruments of the Chinese state, entities legally obligated under China's National Intelligence Law to cooperate secretly with a hostile foreign intelligence apparatus. Users researching medical conditions, mental health, or other

---

[7] Press Release, *Justice Department Implements Critical National Security Program to Protect Americans' Sensitive Data from Foreign Adversaries*, U.S. Dep't of Just. (Apr. 11, 2025), https://www.justice.gov/opa/pr/justice-department-implements-critical-national-security-program-protect-americans-sensitive (internal quotation omitted).

CLASS ACTION COMPLAINT
CASE NO.

sensitive topics may expect many things about how their data will be used to serve ads, but delivery to a foreign military's data-collection network is not among them.

72. These transfers, once made, cannot be taken back. Data transmitted to entities subject to Chinese government control—entities legally compelled to cooperate with state intelligence services—lies beyond the power of Google or any other party to retrieve. Plaintiffs and Class members thus receive no notice that their data has been taken, are afforded no means of preventing its transmission, and possess no remedy once it has been delivered. No user agreed to this arrangement, and federal law prohibits it.

## FACTS SPECIFIC TO PLAINTIFF PEARSON

73. Plaintiff Corinne Pearson is a resident of California. In February and March 2026, Plaintiff Pearson visited the website rxlist.com, an online, consumer-facing medical resource and internet drug index that provides detailed information on brand-name and generic prescription medications.

74. Unknown to Plaintiff Pearson, Google's code is deployed on rxlist.com. Google designed this code to collect and share the personal information and browsing data of users with numerous third parties and to intercept users' communications with the website. Plaintiff Pearson was one such user whose information has been intercepted, compiled, and shared without her consent.

75. While Plaintiff Pearson was actively viewing pages on rxlist.com, her browser loaded Google's JavaScript code that was embedded on the site. This code executed silently and automatically during the page-load process, without any additional action by Plaintiff Pearson. Google's code triggered an identity sync to de-anonymize Plaintiff Pearson's data across multiple identity providers, enhancing the ability of Google and other third parties to recognize and track Plaintiff Pearson across the internet on an ongoing basis. At the same time, Google's code initiated automated bid requests sent from Plaintiff Pearson's browser to Google's servers as part of the real-time bidding auction, even as she accessed online health-related support.

CLASS ACTION COMPLAINT
CASE NO.

76.    These Google-initiated bid requests featured persistent identifiers uniquely associated with Plaintiff Pearson—including her cookie IDs, device IDs, IP addresses, and browser metadata—along with the full URL of the specific health-related page that Plaintiff Pearson was viewing at the time, which included the names of medications she takes for her medical conditions.

77.    In addition, Google initiated user-synchronization with Chinese technology companies linked to the Chinese Communist Party, which transmitted Plaintiff Pearson's persistent identifiers—including IP addresses, advertising identifiers, and cookie data—to Baidu's and Temu's servers.

78.    Plaintiff Pearson did not consent to the interception, sharing, or foreign transmission of her browsing data. Google's conduct caused and continues to cause Plaintiff Pearson concrete and particularized harm, including the unauthorized disclosure of sensitive personal information to a foreign entity, the invasion of her privacy, and the loss of control over how and where sensitive information about her life was shared and used.

### FACTS SPECIFIC TO PLAINTIFF CRUTCHER

79.    Plaintiff Melenie Crutcher is a resident of Florida. In June of 2025, Plaintiff Crutcher visited the website rxlist.com, an online, consumer-facing medical resource and internet drug index that provides detailed information on brand-name and generic prescription medications.

80.    In September 2025 and April 2026, Plaintiff Crutcher visited the website webmd.com, an online repository of health and medical information. Plaintiff Crutcher visited webmd.com searching for information on a specific medical condition.

81.    Unknown to Plaintiff Crutcher, Google's code is deployed on rxlist.com and webmd.com. Google designed this code to collect and share the personal information and browsing data of users with numerous third parties and to intercept users' communications with the website. Plaintiff Crutcher was one such user whose information has been intercepted, compiled, and shared without her consent.

18

CLASS ACTION COMPLAINT
CASE NO.

82. While Plaintiff Crutcher was actively viewing pages on rxlist.com and webmd.com, including an rxlist.com page for a specific medication for a chronic and episodic medical condition and a webmd.com page containing information on a specific medical condition, her browser loaded Google's JavaScript code that was embedded on the site. This code executed silently and automatically during the page-load process, without any additional action by Plaintiff Crutcher. Google's code triggered an identity sync to de-anonymize Plaintiff Crutcher's data across multiple identity providers, enhancing the ability of Google and other third parties to recognize and track Plaintiff Crutcher across the internet on an ongoing basis. At the same time, Google's code initiated automated bid requests sent from Plaintiff Crutcher's browser to Google's servers as part of the real-time bidding auction, even as she accessed online health-related support.

83. These Google-initiated bid requests featured persistent identifiers uniquely associated with Plaintiff Crutcher—including her cookie IDs, device IDs, IP addresses, and browser metadata—along with the full URL of the specific health-related page that Plaintiff Crutcher was viewing at the time, which included the name of the specific medication she was searching for on rxlist.com and the name of the specific medical condition she was researching on webmd.com.

84. In addition, Google initiated user-synchronization with Chinese technology companies linked to the Chinese Communist Party, which transmitted Plaintiff Crutcher's persistent identifiers—including IP addresses, advertising identifiers, and cookie data—to Baidu's and Temu's servers.

85. Plaintiff Crutcher did not consent to the interception, sharing, or foreign transmission of her browsing data. Google's conduct caused and continues to cause Plaintiff Crutcher concrete and particularized harm, including the unauthorized disclosure of sensitive personal information to a foreign entity, the invasion of her privacy, and the loss of control over how and where sensitive information about her life was shared and used.

CLASS ACTION COMPLAINT
CASE NO.

## CLASS ACTION ALLEGATIONS

86.     **Class Definitions**: Plaintiffs bring this proposed class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of themselves and the BSD Class, and a California Class of all others similarly situated (together, the "Classes"), defined as follows:

> **BSD Class**: All individuals in the United States using a website or application incorporating Google's tracking technology whose communications were transmitted to Google and whose personal information was transmitted to Baidu, Temu, or other entities based in the People's Republic of China on or after April 8, 2025.

> **California Class**: All individuals located in California using a website or application incorporating Google's tracking technology whose communications were transmitted to Google.

Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

87.     **Numerosity**: The exact number of members in the Classes is unknown and not available to Plaintiffs at this time, but individual joinder is impracticable. Defendant has many thousands of internet users who fall into the definition of the Classes. Members of the Classes can be identified through Defendant's records and by reference to other objective criteria.

88.     **Commonality and Predominance**: There are questions of law and fact common to the claims of Plaintiffs and the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for members of the Classes include, but are not necessarily limited to, the following:

a.     Whether Defendant's identity-syncing technology caused the unlawful collection of the personal data of Plaintiffs and members of the Classes;

CLASS ACTION COMPLAINT
CASE NO.

b.      Whether Defendant used tracking technologies to cause users' web browsers to reroute electronic communications or other data—including URLs, metadata, and behavioral activity—to Defendant;

c.      Whether Defendant used a device, as defined under 18 U.S.C. § 2510(5), to intercept the contents of communications from Plaintiffs and the Classes;

d.      Whether Defendant obtained valid consent from Plaintiffs and the Classes to intercept and disclose their electronic communications or personal data to third parties;

e.      Whether Defendant unlawfully intercepted or otherwise gathered and used the communications and personal data of Plaintiffs and members of the Classes;

f.      Whether Defendant's interception and disclosure of communications from Plaintiffs and the Classes fall within the ECPA's crime-tort exception to the party-exception provision; and

g.      For the California Class, whether Defendant's conduct violated the California Constitution or intruded upon the privacy rights of California residents.

89.    **Typicality**: Plaintiffs' claims are typical of the claims of members of the Classes. The claims arise from a common nucleus of operative fact—inter alia, the surreptitious interception and illicit collection and sharing of their personal information. Plaintiffs Pearson and Crutcher, like all members of the Classes, had their information unlawfully collected and shared and have been injured by Defendant's misconduct at issue.

90.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Classes. That is, Plaintiffs and the members of the Classes sustained injuries and damages as a result of Defendant's conduct. Plaintiffs also have no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are

21

CLASS ACTION COMPLAINT
CASE NO.

committed to vigorously prosecuting this action on behalf of the members of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have any conflicts with or interests adverse to the Classes.

91.     **Superiority:** Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Classes is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint as well as the risk of inconsistent adjudication. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Through a class action, economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

92.     Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class Definitions" based on facts learned through additional investigation and in discovery.

### FIRST CAUSE OF ACTION
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code § 631(a)**
**(On behalf of Plaintiff Pearson and the California Class)**

93.     Plaintiff Pearson incorporates the foregoing allegations as if fully set forth herein.

94.     Plaintiff Pearson brings this claim on behalf of herself and the California Class under the California Invasion of Privacy Act ("CIPA"), codified in Cal. Penal Code §§ 630–638.

95.     Cal. Penal Code § 631(a) prohibits, in pertinent part:

Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who

22

CLASS ACTION COMPLAINT
CASE NO.

uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section[.]

96.    Defendant Google knowingly and willfully distributes, maintains, and uses tracking scripts and pixels on third-party websites for the purpose of duplicating and diverting user communications to Google's own servers and those of third parties. Google's technologies intentionally capture the contents of users' interactions with these websites and purposefully transmit them to Google and its many integrated demand-side partners.

97.    Google's technologies, including tracking scripts, pixels, and header bidding infrastructure, constitute "machine[s], instrument[s], or contrivance[s]" under CIPA, and even if they do not, Google's deliberate and willful operation of these technologies to facilitate its interceptions falls under the CIPA's statutory catch-all category of "any other manner" of tapping or making an unauthorized connection.

98.    Google's tracking code—JavaScript embedded in the source code of partner websites—executed automatically within Plaintiff Pearson's and California Class members' browsers during the page-load process, contemporaneously with their communications with the website. This code intercepted the contents of Plaintiff Pearson's and California Class members' interactions with those websites by duplicating and redirecting first-party communications—including full URLs and the search queries embedded within them, page titles, and a taxonomical classification of the content of the page—to Google and, on information and belief, other third parties through the ad auction process. These interceptions occurred as part of the browser's rendering sequence, before Plaintiff Pearson or members of the California Class could detect, review, or prevent the transmissions.

99.    As users like Plaintiff Pearson and the California Class members navigate websites such as rxlist.com, Google's JavaScript code causes their browsers to transmit full URLs and the

23

search queries embedded within them, page titles, and other page-level metadata to Google's servers in real time. These transmissions occur without the user's awareness or consent and are initiated automatically during the same browser session in which the user communicates with the website.

100. The data intercepted by Google from Plaintiff Pearson and California Class members includes full-page URLs and the search queries embedded within them. Google reads and redistributes the URL and related contextual information as part of the RTB auction process, learning the contents and context of these communications by Plaintiff Pearson and members of the California Class before the webpage has even finished loading.

101. Google's unlawful interception of communications occurred in a manner that was not authorized by Plaintiff Pearson or California Class members, who did not consent to Google's interception, tracking, or compilation of their communications and personal information—much less to its distribution of that information to foreign adversaries.

102. Plaintiff Pearson and members of the California Class suffered harm as a result of Defendant's violations of CIPA and seek injunctive relief and statutory damages in the amount of $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1).

**SECOND CAUSE OF ACTION**
**Violation of the Electronic Communications Privacy Act ("ECPA")**
**18 U.S.C. § 2510, *et seq*.**
**(On behalf of Plaintiffs and the Classes)**

103. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

104. The ECPA prohibits any person from "intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication[.]" 18 U.S.C. § 2511(1)(a).

105. The ECPA protects both the sending and receipt of communications and provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511(1)(a) and 18 U.S.C. § 2520(a).

24

CLASS ACTION COMPLAINT
CASE NO.

106.    The transmissions between Plaintiffs and Class members and the websites they visit are "transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate or foreign commerce" and therefore constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

107.    **Intentional Interception**: Defendant Google knowingly and intentionally distributes, maintains, and uses tracking scripts, pixels, and header bidding infrastructure on third-party websites for the purpose of rerouting user communications to Google's own servers and those of third parties. Google's technologies intentionally capture the contents of users' interactions with these websites and purposefully transmit them to Google and its integrated demand-side partners, including foreign buyers. Google's tracking code—JavaScript embedded in the source code of partner websites—executed automatically within Plaintiffs' and Class members' browsers during the page-load process. This code intercepted the contents of Plaintiffs' and Class members' interactions with those websites by rerouting first-party communications—including full URLs and the search queries embedded within them, as well as page titles—to Google and, on information and belief, to other third parties as part of the ad auction process after being enriched with other information, including a taxonomical classification of the content of the page. These interceptions occurred as part of the browser's rendering sequence, before Plaintiffs or members of the Classes could detect, review, or prevent the transmissions.

108.    As users like Plaintiffs and members of the Classes navigate websites such as rxlist.com and webmd.com, Google's JavaScript code causes their browsers to transmit full URLs, page titles, and other page-level metadata to Google's servers in real time. These transmissions occur without the user's awareness or consent and are initiated automatically during the same browser session in which the user communicates with the website. Google's capture of these communications constitutes an unlawful interception under the ECPA.

CLASS ACTION COMPLAINT
CASE NO.

109.    **Contents of a Communication**: The data intercepted by Google from Plaintiffs and members of the Classes includes full-page URLs and the search queries embedded within them. These qualify as the "contents" of a communication under 18 U.S.C. § 2510(8) because they reveal the substance and subject matter of the user's communications with the host website.

110.    **Use of a Device**: The technologies Google uses to intercept this data—including JavaScript and tracking pixels—constitute "devices" under 18 U.S.C. § 2510(5), which includes any device or apparatus used to intercept electronic communications.

111.    **Lack of Consent**: Plaintiffs and members of the Classes did not consent to Google's interception or disclosure of their communications. There was no actual or implied consent under applicable law, as no reasonable person would agree to having their personal information diverted to a foreign adversary or other unknown third parties.

112.    **Application of the Crime-Tort Exception on Behalf of Plaintiffs and the BSD Class:** Even if Google were deemed a party to these communications, which it is not, the "party exception" in 18 U.S.C. § 2511(2)(d) does not apply. At the time of the interception, Google intended to use these communications for the independent purpose of unlawfully transmitting bulk U.S. sensitive personal data to a covered foreign entity in violation of the BSD Rule, 28 C.F.R. Part 202. These criminal and tortious acts are distinct from the act of interception itself, in that the unlawful conduct is the subsequent transmission of Plaintiffs' and BSD Class members' sensitive data to Temu and Baidu, as alleged below.

113.    On or after April 8, 2025, Google knowingly engaged in prohibited data-brokerage transactions with Baidu and Temu, each a "covered person" under the BSD Rule as alleged below, in violation of the BSD Rule. 28 C.F.R. § 202.301(a).

114.    Google is a company organized and existing under the laws of Delaware, with its principal place of business located in the State of California. Because Google is organized under the laws of the United States and is an entity in the United States, Google is a "U.S. person" under 28 C.F.R. § 202.256.

26

CLASS ACTION COMPLAINT
CASE NO.

115. Baidu, Inc. qualifies as a "covered person" under 28 C.F.R. § 202.211(a) because it is a Chinese company, headquartered in Beijing, with substantial operations and executive oversight in the People's Republic of China—a "country of concern" under the BSD Rule.

116. Temu qualifies as a "covered person" under 28 C.F.R. § 202.211(a) because it is operated and controlled by PDD Holdings, Inc., a Chinese company with substantial operations and executive oversight in the People's Republic of China—a "country of concern" under the BSD Rule. Although PDD Holdings nominally lists its principal executive offices in Ireland, it maintains a significant presence in China.

117. Like Baidu, Temu is subject to Chinese law, including China's National Intelligence Law, Cybersecurity Law, and Data Security Law. These laws compel Chinese companies and individuals to secretly cooperate with government surveillance efforts and grant authorities unrestricted access to private user data. The operations of Baidu and Temu are therefore presumptively subject to Chinese government control, oversight, and compelled disclosure obligations.

118. On websites such as rxlist.com visited by Plaintiffs Pearson and Crutcher and webmd.com visited by Plaintiff Crutcher, and the websites visited by members of the BSD Class, Google initiates identity synchronization requests with Baidu and Temu infrastructure (including by initiating network requests to gtrace.mediago.io/ju/cs/google for communications with Baidu and www.temu.com/api/adx/cm/pixel-google for communications with Temu), which result in the transmission of numerous protected "listed identifiers" under the BSD Rule, including but not limited to IP addresses (28 C.F.R. § 202.234(g)), advertising IDs (28 C.F.R. § 202.234(e)), and cookie data (28 C.F.R. § 202.234(g)).

119. Google transmits these protected identifiers together, including, for example, transmitting a given user's IP address along with the user's cookie data and a Google advertising ID (the Google User ID), such that the identifiers are clearly linked with one another and are associated or reasonably capable of being associated with each related user.

CLASS ACTION COMPLAINT
CASE NO.

120. Google failed to take reasonable steps to minimize this communication and data sharing with prohibited covered entities. To the contrary, as described throughout this Complaint, Google's real-time bidding and identity-synchronization infrastructure was deliberately engineered to maximize the collection, enrichment, and distribution of user data to its partners—including Baidu and Temu. Despite designing, operating, and controlling every technical component of these integrations, Google took no steps to terminate or restrict its identity-synchronization integrations with Baidu or Temu after the BSD Rule took effect, after Baidu's designation on the Pentagon's 1260H List, or after widespread public reporting and state enforcement actions documenting Temu's data practices.

121. While the above already represents a significant violation of user privacy, on information and belief, the full scope of user data that Defendant transmits to Baidu and Temu—enabled through standard identifiers in real-time bidding—goes well beyond what an end user can directly observe. On information and belief, server-to-server communications between Google and these Chinese companies transmit information such as device IDs (28 C.F.R. § 202.234(c)), user behavioral signals, and a multitude of other advertising identifiers.

122. This information qualifies as "covered personal identifiers" and "sensitive personal data" under the BSD Rule because these identifiers are shared with Baidu and Temu, 1) in combination with at least one other listed identifier, or 2) in combination with other data such that the listed identifier is or can reasonably be associated with other listed identifiers or other sensitive personal data. 28 C.F.R. §§ 202.212(a), 202.249(a).

123. On information and belief, Google has collected or maintained this sensitive personal data relating to more than 100,000 U.S. persons (including Plaintiffs and the BSD Class members) following the effective date of the BSD Rule, and therefore this information constitutes "bulk U.S. sensitive data" under 28 C.F.R. § 202.206.

124. On information and belief, Google provides this information to Baidu and Temu as part of independent commercial transactions between Google and the Chinese companies. Neither

28

CLASS ACTION COMPLAINT
CASE NO.

Baidu nor Temu itself collected or processed this data directly from the relevant individuals, and Google's provision of this bulk U.S. sensitive data to Baidu and Temu, covered persons, constitutes a "covered data transaction involving data brokerage" under 28 C.F.R. §§ 202.210, 202.214, and 202.214(b)(4)-(9).

125.    Google is a sophisticated entity in the digital advertising industry. It is a member of industry associations that directly participated in the BSD Rule rulemaking process and publicly warned members of the legal risks of transmitting certain data to entities based in China. Google's parent company, Alphabet Inc., likewise acknowledged in its SEC filings that it actively monitors privacy and data transfer regulations, including cross-border restrictions. And Google publicly lists Baidu and Temu as integration partners. For these reasons, Google knew or reasonably should have known that it had engaged and was engaging in covered data transactions involving data brokerage in violation of the BSD Rule.

126.    Because Google knowingly engaged and engages in covered data transactions involving data brokerage with Baidu and Temu, each a covered person, Google has violated the BSD Rule's prohibition of data-brokerage transactions under 28 C.F.R. § 202.301(a).

127.    Because Google intentionally and knowingly intercepted and disclosed Plaintiffs' and the BSD Class members' communications with the independent purpose, existing at the time of each interception, of committing these unlawful acts, it is not shielded by the "party exception" under the ECPA.

128.    **Application of the Crime-Tort Exception on Behalf of Plaintiff Pearson and the California Class**: At the time of the interception, Google's interception of the at-issue communications was knowingly and intentionally performed for the independent purpose of committing tortious acts in violation of California common law, specifically:

  a.    Committing the tort of intrusion upon seclusion under California common law by using the contents of the intercepted communications and the related personal information to enable third parties to track and profile Plaintiff Pearson and

29

California Class members, and further exposing their personal information, as described herein; and

b.    Violating the right to privacy conferred by the California Constitution by using the contents of the intercepted communications and the related personal information to enable third parties to track and profile Plaintiff Pearson and California Class members, and further exposing their personal information, as described herein.

129.    Because Google intentionally and knowingly intercepted and disclosed Plaintiff Pearson's and California Class members' communications for the purpose of committing these tortious acts, it is not shielded by the "party exception" under the ECPA.

130.    Plaintiffs and the Classes have suffered and continue to suffer harm as a result of Defendant's violations of the ECPA, including the transmission of Plaintiffs' and BSD Class members' sensitive data to a foreign adversary, and the disclosure of Plaintiff Pearson's and the California Class members' sensitive information thereby enabling extensive third-party tracking, and therefore seek (a) preliminary, equitable, and declaratory relief as may be appropriate, (b) the sum of the actual damages suffered and disgorgement of profits obtained by Defendant as a result of its unlawful conduct, or statutory damages as authorized by 18 U.S.C. § 2520(c)(2), whichever is greater, (c) punitive damages, and (d) reasonable costs and attorneys' fees.

**THIRD CAUSE OF ACTION**
**Intrusion Upon Seclusion Under California Common Law**
**(On behalf of Plaintiff Pearson and the California Class)**

131.    Plaintiff Pearson and the California Class members incorporate the foregoing allegations as if fully set forth herein.

132.    Plaintiff Pearson and the California Class members have a legally protected privacy interest in their communications with the websites they choose to visit—including sensitive communications revealing their medical conditions, medications, and other deeply personal matters.

30

CLASS ACTION COMPLAINT
CASE NO.

That interest includes the right to limit who accesses, collects, and disseminates their personal data, and to prevent the covert transmission of their identities and browsing activity to unknown third parties, including entities controlled by a foreign adversary of the United States.

133. Plaintiff Pearson and the California Class members reasonably expected that their communications with the websites they visited would remain between them and those websites. No reasonable person expects that visiting a website—including one involving sensitive subject matter—will cause their browser, silently and at Google's direction, to transmit their persistent identifiers and IP address directly to the servers of companies operating under the jurisdiction and control of the People's Republic of China, including at least one company the Pentagon has formally designated a Chinese Military Company.

134. Google intentionally intrudes upon these protected interests by invisibly monitoring, intercepting, and distributing the sensitive personal information of Plaintiff Pearson and the California Class members through its automated advertising platform—sharing it with third parties, including entities closely linked to foreign adversaries of the United States, that use it to profile, track, and analyze the behavior of Americans across the internet.

135. As part of these intrusions, Google engages in identity-syncing, associating its persistent identifiers (like the Google User ID) with those maintained by third parties, including entities affiliated with foreign adversaries of the United States. In so doing, Google enables those parties to correlate Google's data with their own, construct detailed behavioral profiles, and target individuals based on sensitive personal information that originated with Google's own interception and disclosure.

136. Google's intrusions are highly offensive. Secretly collecting such data in sensitive contexts is highly offensive. Enabling third parties to engage in extensive tracking and profiling of unsuspecting users—including by syncing identifiers that allow those parties to personally identify users and build detailed behavioral profiles on them—is highly offensive. And disclosing this data,

31

which includes sensitive personal information, to a global network of third parties that includes entities linked to foreign adversaries of the United States is highly offensive.

137.   The covert manner of the collection, the sensitivity of the information involved, the scale of the data sharing, and the dangers posed by the entities receiving the data confirm that Google's conduct violates Plaintiff Pearson's and the California Class members' reasonable expectations of privacy and profoundly violates social norms.

138.   Plaintiff Pearson and California Class members have been damaged by Google's extensive and intentional intrusions upon their privacy interests and are entitled to vindication of their rights, just compensation, and injunctive relief.

## FOURTH CAUSE OF ACTION
### Invasion of Privacy Under the California Constitution
### (On behalf of Plaintiff Pearson and the California Class)

139.   Plaintiff Pearson and the California Class members incorporate the foregoing allegations as if fully set forth herein.

140.   Article I, Section 1 of the California Constitution guarantees to every California citizen the inalienable right to privacy.

141.   Plaintiff Pearson and the California Class members reallege and incorporate by reference the factual allegations set forth in ¶¶ 132–137 which describe Google's intentional, highly offensive invasion of Plaintiff Pearson's and California Class members' reasonable expectation of privacy, and which independently satisfy the elements of a claim under Article I of the California Constitution.

142.   As a result of Google's intentional violations of Plaintiff Pearson's and the California Class members' constitutional right to privacy under the California Constitution, Plaintiff Pearson and the California Class members have suffered legally cognizable harm and are entitled to just compensation and injunctive relief.

32

CLASS ACTION COMPLAINT
CASE NO.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Corinne Pearson and Melenie Crutcher individually and on behalf of the Classes, pray for the following relief:

(a)    An order certifying the BSD Class and the California Class as defined above; appointing Plaintiffs as class representatives of the BSD Class; appointing Plaintiff Pearson as class representative of the California Class; and appointing Plaintiffs' counsel as Class Counsel;

(b)    A judgment holding that Defendant's actions, as set out above, violate the ECPA, 18 U.S.C. § 2510, *et seq.*, with respect to Plaintiffs and the BSD Class;

(c)    A judgment holding that Defendant's actions, as set out above, intrude upon the seclusion of, and violate the California constitutional privacy rights of, Plaintiff Pearson and the California Class;

(d)    A judgment holding that Defendant's actions, as set out above, violate CIPA, Cal. Penal Code § 631(a), with respect to Plaintiff Pearson and the California Class;

(e)    An injunction requiring Defendant to cease all unlawful activities;

(f)    A judgment awarding statutory damages, disgorgement of profits, punitive damages, costs, and attorneys' fees; and

(g)    Such other and further relief that the Court deems reasonable and just.

**JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: July 20, 2026

By: */s/ Brandt Silverkorn*
*One of Plaintiffs' Attorneys*

Brandt Silverkorn (SBN 323530)
bsilverkorn@edelson.com
EDELSON PC

33

CLASS ACTION COMPLAINT
CASE NO.

150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiffs and the Putative Classes*

CLASS ACTION COMPLAINT
CASE NO.